**Pages 1 - 32**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Haywood S. Gilliam, Jr., Judge

GRACE SMITH, ET AL.,         )
                               )
         Plaintiffs,     )
                               )
  VS.                    )    **NO. CV 21-07872-HSG**
                               )
MARY WATANABE, ET AL.,     )
                               )
         Defendants.     )
_____)

Oakland, California
Thursday, May 19, 2022

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

                DISABILITY RIGHTS EDUCATION AND DEFENSE
                FUND
                3075 Adeline Street, Suite 210
                Berkeley, CA  94703
          BY:  **CLAUDIA CENTER, ESQUIRE**
                **CARLY MYERS, ESQUIRE**
                **SILVIA YEE, ESQUIRE**

                ROSEN BIEN GALVAN & GRUNFELD LLP
                101 Mission Street, Sixth Floor
                San Francisco, CA  94105
          BY:  **ERNEST GALVAN, ESQUIRE**
                **MICHAEL NUNEZ, ESQUIRE**

Reported By:     Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
                  Official Reporter

```
APPEARANCES CONTINUED:

For Defendants California Department of Managed Health Care and
Mary Watanabe:
                        CALIFORNIA DEPARTMENT OF JUSTICE
                        Office of the Attorney General
                        455 Golden Gate Street, Suite 11000
                        San Francisco, CA  94102
                BY:  JOSHUA SONDHEIMER,
                     DEPUTY ATTORNEY GENERAL

For Kaiser Foundation Health Plan, Inc.:
                        SHEPPARD MULLIN RICHTER & HAMPTON LLP
                        333 South Hope Street, 43rd Floor
                        Los Angeles, CA  90071
                BY:  MOHAMMAD KESHAVARZI, ESQUIRE
```

| | |
|---|---|
| 1 | **Thursday - May 19, 2022**                    **2:00 p.m.** |
| 2 | P R O C E E D I N G S |
| 3 | ---oOo--- |
| 4 | **THE CLERK:**  Your Honor, we're calling CV 21-7872, |
| 5 | Smith, et al. vs. Watanabe, et al. |
| 6 | Please step forward and state your appearances for the |
| 7 | record, please. |
| 8 | **MS. CENTER:**  Claudia Center for plaintiffs. |
| 9 | **MR. SONDHEIMER:**  Good afternoon, Your Honor.  Joshua |
| 10 | Sondheimer for the Department of Managed Healthcare and its |
| 11 | director, Mary Watanabe. |
| 12 | **MR. KESHAVARZI:**  Good afternoon, Your Honor.  Moe |
| 13 | Keshavarzi for Kaiser Foundation Health Plan. |
| 14 | **THE COURT:**  All right.  Good afternoon to you all. |
| 15 | So as you saw, Kaiser's motions are submitted, although I |
| 16 | assume you want to keep track of the proceedings nonetheless, |
| 17 | but you won't be called on to argue today. |
| 18 | **MR. KESHAVARZI:**  And Your Honor had the initial status |
| 19 | conference still on calendar, which is why I thought I was |
| 20 | needed here. |
| 21 | **THE COURT:**  Good thinking.  We'll see what we do with |
| 22 | that. |
| 23 | **MR. KESHAVARZI:**  Okay. |
| 24 | **THE COURT:**  All right.  So really the motions that I |
| 25 | wanted to hear argument on is the motion by the State to |

1    dismiss.  Really I want to focus on a few areas.

2         I've gone through the papers.  Obviously it's a somewhat

3    involved area of the law, but I really have some targeted areas

4    I wanted to focus on.

5         And so the first is the sovereign immunity argument, and

6    then we'll talk about a couple of dimensions of the merits

7    argument.

8         Just starting from the start, as I read the *Sharer* case

9    from the Ninth Circuit, in focusing on whether there is a

10   waiver of immunity based on the receipt of federal funds, I'm

11   to look in what appears to be a very granular way at whether

12   the entity was receiving funds during the period of the

13   violation.  That's the way that I read the Ninth Circuit's

14   guidance in *Sharer*.  And so there really is a doctrinal

15   question and then there is just a very factual question.  And

16   why don't we start with the factual piece.

17        I saw that there was a declaration from the DMHC chief

18   counsel that essentially said DMHC does not receive any federal

19   assistance, and it appears undisputed that the Department

20   hasn't received any federal assistance for some time.

21        The question, though, it seems to me under *Sharer* is

22   whether the Department was receiving federal assistance at the

23   time of the claimed violation, which here is the codification

24   of the benchmark regulations that, as a function of the benefit

25   design, exclude coverage of medically-necessary wheelchairs.

1    That's the gist of the allegation in the Complaint.

2        And so really the two questions -- and I think this is for

3    the State -- first is what is the evidence in the record as to

4    when that design process occurred, and, second, what's the

5    nature of the evidence then as to whether the Department was or

6    wasn't receiving federal assistance at that time because it

7    does seem to me that *Sharer* focuses on the time of the claimed

8    injury.

9        **MR. SONDHEIMER:**  Certainly, Your Honor.

10       If I may, I need to go back and take a look at the -- at

11   the relief sought in the *Sharer* case, but we have taken the

12   position here that because the plaintiffs are seeking solely

13   prospective equitable relief, that the question is whether the

14   State is receiving federal financial assistance at present for

15   purposes of immunity, and that's also supported by the language

16   of the statute itself, Section 1557, which would waive the

17   State's immunity only to the extent that it, quote, is

18   receiving, unquote, federal financial assistance.

19       So we believe that the inquiry is -- is to the present.

20       **THE COURT:**  But how is that different than *Sharer*?

21   *Sharer* just very specifically said -- it was -- it was a

22   discussion of Section 504, but Section 504's reach "encompasses

23   a department or agency receiving federal funds in only those

24   periods during which the funds are accepted," but then the

25   court there distinguished the -- some of the evidence that the

1  plaintiff is bringing in by saying well, that was before the

2  receipt of the funds.

3      Don't I need to know what the lay of the land was at the

4  time the challenged violation happened?  Isn't that the right

5  standard?

6      It would be a strange read of sovereign immunity to say

7  that even if the entity was receiving federal funds at the time

8  the violation occurred, they can essentially evade

9  responsibility for that using sovereign immunity by not taking

10  funds later.  I'm not sure that makes much sense.

11      MR. SONDHEIMER:  Well, Your Honor, I think that is

12  supported by the nature of the relief in that certainly if the

13  plaintiffs were seeking damages, then -- then I believe there

14  is case law that supports looking back in time to -- to whether

15  the entity was receiving federal funds at -- in the past, but

16  given the -- the prospective relief that plaintiffs are

17  seeking, we believe that the proper inquiry is whether there

18  was current receipt of federal funds.

19      THE COURT:  Is that true, that the only remedy sought

20  is injunctive relief?

21      MS. CENTER:  That's correct, Your Honor.

22      THE COURT:  All right.  So that, I suppose, could be a

23  distinction from *Sharer* if the idea is that going forward, the

24  entity would need to be covered, the agency then -- why is it

25  enough to say that they got funds in the past, they might get

funds in the future?  I mean, doesn't -- it seems to me *Sharer*

says we have to look at some point in time.  How you define the

point in time may be the question and that might have to do

with this distinction between prospective injunctive relief and

damages relief, but, at any rate, if the agency is not

receiving federal funds now, how can I find a waiver for

purposes of the analysis in *Sharer*?

   **MS. CENTER:**  Well, Your Honor, I think there are three

points I'd like to make on that.

   The first is that the *Sharer* court did not consider the

assurance required for federal funds received that are

earmarked for personal property, and that's an assurance that

is not just some, you know, side assurance.  It's contained

within the -- the assurance certificate.  It goes all the way

back to the first regulations implementing Title VI of the

Civil Rights Act of 1964.  It was adopted in the regulations

implementing Section 504 in 1977 with the consultation of

Congress.  Congress then went ahead and reenacted the

Rehabilitation Act several times.  And, you know, there's

Supreme Court case law -- *Darrone* and *Arline* and *Choate* -- that

talks about how the Section 504 regulations are entitled to

particular deference because of the intertwined -- you know,

the hearings that happened with Congress and the oversight.

   And those regulations say that "In the case of federal

financial assistance extended to provide personal property, the

1    assurance will obligate the recipient for the period during

2    which it retains ownership or property" -- "or possession of

3    the property."

4         And so in this case, the Department got earmarked federal

5    funds to create a data center, 3.1 million, and it's undisputed

6    or -- well, if it is disputed -- I don't think it is -- but we

7    believe it's undisputed that they still possess and use this

8    data center.  It's their primary way of interacting with

9    consumers.

10        They, as all recipients of federal financial assistance

11   from Health and Human Services, sign an assurance that says --

12   and it's kind of long -- but, "If any real property or

13   structure therein is provided or improved with the aid of

14   federal financial assistance," dot dot dot, "this assurance

15   shall obligate the applicant for the period during which the

16   real property or structure is used for a purpose for which the

17   federal financial aid is extended," etc. and then it says the

18   same sentence for personal property.  "If any personal property

19   is so provided, this assurance shall obligate the applicant for

20   the period during which it retains ownership or possession of

21   the property."

22        So every recipient of federal financial assistance from

23   HHS, such as DMHC, signs that assurance, and *Cummings*, you

24   know, just decided by the Supreme Court, says that you look at

25   what the contract contains, and so that's in the contract.

1     **THE COURT:**  But stepping back, I mean, really the

2   threshold issue here is sovereign immunity and whether the

3   State has waived sovereign immunity, and as I understand it,

4   that's a function of the statutory text, not HHS's regulations.

5     Are you aware of case law in which regulations have been

6   analyzed in the way that you're doing to defeat a sovereign

7   immunity argument?  It seems to me what the case law tells me

8   is that it has to be an unambiguous waiver within the statutory

9   text, and so I'm curious as to what the relevance of the

10  regulations is at all.

11    **MS. CENTER:**  Well, in *Cummings*, the court -- the

12  majority opinion really focuses on the notice to the recipient

13  of federal financial assistance and to the nature of contract

14  law.  And so if it's in the actual document that the recipient

15  signs, then I think that is an explicit waiver of sovereign

16  immunity.

17    **THE COURT:**  Did *Cummings* talk about sovereign

18  immunity?

19    **MS. CENTER:**  Excuse me?

20    **THE COURT:**  Was *Cummings* addressing sovereign

21  immunity?  I just am not remembering that case off the top

22  of --

23    **MS. CENTER:**  Well, no -- well, yes, sort of -- no.

24  I'm sorry.  It was addressing whether the recipient of federal

25  financial assistance was on notice and had agreed to be liable

for emotional distress damages.  So it was a decision issued
about three weeks ago.  So I don't know if that touches on
sovereign immunity or not.

**THE COURT:**  Well, then, really the question is are you
aware of any case that has looked to regulations in the way
that you're doing now to find that notwithstanding it not being
in the statutory text, nonetheless I can read it to be a clear
waiver of sovereign immunity?

**MS. CENTER:**  I'm not aware of any, no.

I would also, though, like to go on to talk about the
*Sharer* case.  So what the *Sharer* case did is do sort of a
fact-specific analysis on summary judgment, so there was
discovery, and looked at whether the judicial commission was
distinct from the judicial department for purposes of federal
financial assistance and then the associated question of
sovereign immunity.

And so they looked at the question of were the entities
sufficiently independent to constitute separate departments or
agencies, were there separate financing mechanisms and a
distinct chain of command re administrative authority and
supervision, are the two agencies independent.

So in this case, it's -- it's not the same facts.  So in
this case, DMHC is integrally -- integrally intertwined with
federally-financed healthcare in California.  Federally-funded
healthcare in California doesn't exist without CDMHC which

1    licenses and regulates, ensures that the plans are financially

2    stable, in compliance with the law, ensures that the medical

3    groups in contract are financially solvent, ensures that

4    proposed rate changes are justified and reasonable, responds to

5    health consumer complaints, administers the IMR program for all

6    of the federally-funded health programs, and has the same

7    administrative chain of command as the Department of Healthcare

8    Services.

9        **THE COURT:**  Right.  But it seems to me those are all

10   factual distinctions but not ones that go to the core holding,

11   which is that the waiver, if there is a waiver, only applies

12   when federal funds are received during the -- for the period

13   during which the funds are accepted.  That was really the core

14   of the holding; right?  It didn't rely on the nuts and bolts of

15   exactly how the agency worked.  It's a bright-line rule about

16   what is required to find a waiver of sovereign immunity.

17       **MS. CENTER:**  Right.  I -- I guess my point in -- with

18   regard to *Sharer* is that we know that the Department of

19   Healthcare Services receives billions of dollars in federal

20   financial assistance every year, and so if DMHC is part and

21   parcel of the Department of Healthcare Services, if they are

22   intertwined in that way, them DMHC itself is also considered to

23   be a recipient of federal financial assistance.  And in *Sharer*,

24   the -- after the court looked at the facts, they say, "No, no,

25   they are completely separate.  Don't consider them together."

1          But also in the alternative, what we could do is we could

2    amend the Complaint to name the California Health and Human

3    Services Agency.  It is undisputed that the Health and Human

4    Services Agency is -- and this is a quote from 1557 -- "a

5    health program or activity, any part of which is receiving

6    federal financial assistance."  So any part of Cal HHS includes

7    the Department of Healthcare Services, which alone gets $84

8    billion in the most recent year for Medi-Cal.

9          So that's, you know -- that's another way to -- that we

10   could proceed and show a waiver of sovereign immunity.

11             **THE COURT:**  All right.  Although that would be in an

12   Amended Complaint.

13             **MS. CENTER:**  Correct, Your Honor.

14             **THE COURT:**  Against a different defendant.

15             **MS. CENTER:**  Correct.  If you -- if you are

16   unpersuaded by our other arguments regarding DMHC.

17             **THE COURT:**  Well, let me ask this:  What do you --

18   let's say -- I am not definitively saying this is the answer

19   but for the sake of discussion, let's say I disagree with the

20   regulation-based personal property argument.

21          It is undisputed, as I take it, that DMHC itself hasn't

22   received federal funds since, I think, 2017; is that correct?

23             **MS. CENTER:**  As far as we know, yes, that's correct.

24   It's -- you know, discovery could show indirect receipt, but as

25   far as we know, no.

1      **THE COURT:**  All right.  And if that is the case,

2    what's your response to the State's argument that the

3    injunctive-only nature of the relief precludes a finding of an

4    unequivocal statutory waiver?

5      **MS. CENTER:**  Well, they acknowledge that they adopted

6    the standards that we are challenging.  They adopted those

7    standards when they were receiving federal financial

8    assistance, and they readopted them in 2016, and, again, they

9    were -- it's undisputed they were receiving federal financial

10   assistance in 2016.

11     **THE COURT:**  But where in the record does it say the

12   codification of the regulations that you are challenging

13   occurred during that time frame just as a factual matter?

14     **MS. CENTER:**  Right.  So it's Cal Code Regs Title 28,

15   Section 1300.67.005, and I believe that was adopted in 2013,

16   but I'm going to look at my colleagues to double check.

17     **THE COURT:**  And I'll ask Mr. Sondheimer, do you

18   dispute that, that the relevant codification that is the

19   subject of the lawsuit regarding wheelchairs happened in 2013?

20     **MR. SONDHEIMER:**  No, Your Honor.  I was just looking

21   for the dates.  2013, I guess, was the initial promulgation,

22   and the regulations were last amended, as far as I understand,

23   in November 2016.

24     **THE COURT:**  I see.  All right.  So that's helpful.

25     So really from your perspective, it sounds like the entire

1    argument boils down to this question of whether because the

2    nature of the relief is injunctive, I only look at today or

3    I -- *Sharer* seems to suggest look at the time, whether funds

4    were being received at the time of the action complained of.  I

5    mean, that really seems determinative of this argument, which

6    of those two ways that I go.

7          MR. SONDHEIMER:  Your Honor, if -- I -- which I --

8    I'm -- I admit that I focused on the element of *Sharer* that I

9    understood to be the critical aspect of the decision which was

10   the -- you know, whether funding could be imputed to the public

11   defender service based on the funding to the -- to the Oregon

12   judiciary and did not focus on the timing aspect of that.

13        We would be happy to submit additional briefing on that --

14   on that question as that was not an issue also that was focused

15   on by the plaintiffs, if that would be helpful to the Court.

16        But I would note that in *Sharer*, just if I may respond

17   briefly, *Sharer* was quite clear in response to the plaintiffs'

18   argument that the Court can look to the relevant state law to

19   determine whether the entities at issue are -- are in fact

20   distinct entities for purposes of the sovereign immunity

21   analysis.  And we've identified both decisional law and

22   statutory law in the state that makes quite clear that the

23   Department of Managed Health Care is considered a

24   legally-distinct entity from other state agencies, including

25   the Health and Human Services Agency.  And so, you know,

1    funding to HHSA should not be imputed to the Department of

2    Managed Health Care.

3            **THE COURT:**  Right.  But if there is a problem with the

4    sovereign immunity argument, what I understood opposing counsel

5    to be saying is, "Okay, we'll sue another entity, and that

6    entity won't present that problem." Why -- if I find even that

7    there's a problem, why would it not be appropriate to give them

8    leave to amend to try to do that?  Why would it be futile?

9            **MR. SONDHEIMER:**  Based on the -- the decisional

10   statutory law, Your Honor, that we cite in our papers -- I have

11   to take a moment to find that, but state law is very clear that

12   the state agencies have their own distinct legal status, and I

13   don't -- I don't believe that the plaintiffs have offered

14   any -- any case that suggests that sister agencies can be --

15   can be -- that -- sorry -- funding for one agency may be

16   imputed to a sister agency based on funding to an overarching

17   state agency.  I think *Sharer* suggests quite the opposite, in

18   fact.

19           **THE COURT:**  Right.  But then wouldn't that be the

20   basis for a motion to dismiss then by that defendant, that --

21   I'm assuming what you're saying is, "Well, you can't sue us

22   because we didn't actually take the action.  The DMCH

23   actually -- DMHC actually took the action."  What they're

24   saying is, "Okay, if there's a sovereign immunity problem as to

25   this entity, we'll amend, and we'll sue this entity that we

know got the money," and maybe the response to that would be, well, but that entity is not responsible for the action that is being challenged, and that would be the basis for a motion to dismiss.

But would it be inherently futile to allow them to try that if I found that there was a sovereign immunity problem with respect to your client?

**MR. SONDHEIMER:**  I -- I believe it would be futile, Your Honor, because -- because of the distinct nature of the state entities under state law as well as, as you identified, the fact that the Health and Human Services Agency was not involved in adopting the regulations.

I think it's relevant here as well, Your Honor, that -- that by plaintiffs' own argument, DMHC here had merely codified regulations, the -- essential health benefit requirements that were established by the legislature, and the plaintiffs don't challenge the action by the legislature.

I think that -- so to the extent that the Court's considering the significance of the codification of those -- the enactment, if you will, of those regulations, we don't believe that that is a distinct, you know, discretionary action that -- that would carry legal significance for purposes of sovereign immunity.

**THE COURT:**  Okay.  Well, I think I understand the lay of the land, at least as far as the arguments that have been

1    made.  I may take you up on some supplemental briefing on it if

2    I think it would be helpful, but --

3              MS. CENTER:  Your Honor, one response?

4              THE COURT:  Sure.

5              MS. CENTER:  So the state law about the distinct legal

6    entities, that wouldn't be -- that wouldn't be authoritative to

7    whether something is a health program or activity, any part of

8    which is receiving federal financial assistance for purposes of

9    federal law.  And we -- we have cases about the sister --

10   sister departments.

11             THE COURT:  Right.  Although I think we only get to

12   any of this if I find that there has not been a waiver of

13   sovereign immunity --

14             MS. CENTER:  Right.

15             THE COURT:  -- as to the defendant that has actually

16   been sued, and then the question is one way or the other, is it

17   proper to allow amendment or would it be futile, and I think I

18   would probably -- before I tried to rule on that given that

19   it's a couple layers past what the parties were focused on, I

20   would probably request briefing on point.

21        So why don't we move to the -- the -- a couple merits

22   issues, and I don't need to hear argument on standing, but

23   really the two are one that I thought was pretty

24   straightforward which was this question of whether it's a

25   covered benefit, and then there are a couple that go to the

1    nature of the claim that the plaintiffs are bringing and

2    whether -- and how the *Schmitt* decision applies.

3        So first with respect to the -- the covered benefit issue,

4    as I read it, the defendant is saying that wheelchairs intended

5    for use outside the home is not a covered benefit, it's not on

6    the list, but it seems to me I found plaintiffs' response to

7    that persuasive, which is that *Schmitt* says that the list isn't

8    determinative.  It's not the beginning and the end.  The court

9    described it as the starting point for determining essential

10   health benefits in that whether compliance with Section 1557

11   has been achieved is a question of federal law on which the

12   federal courts don't defer to the state, and so I'm wondering

13   why *Schmitt* doesn't itself defeat that argument that the fact

14   that wheelchairs are not on the list somehow matters in terms

15   of deciding a motion to dismiss.

16        **MR. SONDHEIMER:**  Your Honor, I -- well, I -- I think

17   what I would say is that ultimately our argument on the merits,

18   as we focused on the reply, is the absence of allegations

19   that -- that go towards -- that support a conclusion that

20   the -- that the regulations were adopted with the -- for the

21   sole reason of -- of discriminating on the basis of disability.

22        And the plaintiffs have offered really just simply the

23   exclusion, if you will, itself, and that, under the law that we

24   cited, is just not sufficient to meet the standard for

25   demonstrating disability, discrimination on the basis of

1    disability.

2         **THE COURT:**  Right.  In that regard, though -- and

3    probably it's time just to move to *Schmitt* -- here is my

4    reading of *Schmitt* and you can tell me where you think you

5    differ.

6         First, it seems to me that *Schmitt* held that a

7    discriminatory benefit design claim in itself inherently

8    involves intentional conduct, and that's a quote from the case.

9    So that's A.

10        B, it struck me that the way that the *Schmitt* court

11   analyzed it was to say even if there were no allegations of

12   facts giving rise to an inference of intentional discrimination

13   besides the exclusion, then I move to this next step which is

14   this proxy claim and decide whether that's been adequately

15   pled.

16        So at least in terms of the framework, are you in

17   agreement that that's what *Schmitt* lays out?

18        **MR. SONDHEIMER:**  If I -- if I understand, I think

19   that's an accurate reflection of the *Schmitt* case, Your Honor.

20   I -- I -- if I understand your -- your summary, I believe

21   that's an accurate reflection.

22        **THE COURT:**  All right.

23        So then I will ask the plaintiffs just a clarifying

24   question.  Are you bringing any claim here other than a

25   discrimination-by-proxy claim?  Is that the nature of your

1  claim?

2      MS. CENTER:  That's the nature of our claim.  A

3  benefit design that discriminates by proxy against people who

4  use wheelchairs.

5      THE COURT:  Okay.  So in that framing and walking

6  through the way that *Schmitt* seemed to analyze it, you're in

7  agreement that there's not -- that you haven't alleged facts

8  giving rise to an inference of intentional discrimination by

9  the exclusion, but the point is under a proxy theory, you don't

10 have to, and so that's where we should really look.  Is that

11 fair in terms of --

12     MS. CENTER:  Yes.  The only other item I'd say is

13 that, you know, the Department went through and listed a number

14 of very specific DME items but not wheelchairs, and so that

15 to -- you know, is additional evidence of -- of disregard, you

16 know -- deliberate indifference, which is a form of intent.

17     THE COURT:  So I think there you just said you're

18 trying to do both.  You're trying to do an intentional

19 discrimination claim and you're also bringing a proxy claim,

20 but a minute ago I understood you to say it was a proxy theory.

21     MS. CENTER:  I'm sorry.  I think I see them as all

22 intertwined, but, yes, proxy discrimination against people who

23 use wheelchairs and against a background of what we see as --

24 as deliberate indifference where certain benefits are listed

25 out from a DME category but not wheelchairs, which we consider

1    to be a very foundational form of DME.

2              **THE COURT:**  In your -- what in the Complaint alleges

3    facts that tend to suggest discrimination beyond just the

4    exclusion which seems to me what you just said is they listed a

5    bunch of things but didn't list this one, but that by

6    definition is the exclusion itself.  Are you saying you're

7    alleging other facts that you believe support an inference of

8    discrimination beyond that?

9              **MS. CENTER:**  No other facts.  You know, there is a

10   sort of ongoing review of plans and, you know, there's some

11   ongoing reiteration of those facts, but, yes, same facts.

12             **THE COURT:**  All right.  So I think then basically we

13   are in discrimination-by-proxy territory for purposes of

14   *Schmitt* given the claim that's actually been brought, you know,

15   and then the -- the -- you know, the interesting task that the

16   case puts me to is figuring out whether the proxy's fit is

17   sufficiently close to make a discriminatory inference

18   plausible.  That's really the way I'm supposed to assess the

19   issue.

20        And the case talks about under-inclusiveness and

21   over-inclusiveness and the things that can make for a -- a good

22   fit that's sufficient to plead this theory and things that tend

23   to undermine the adequacy of the theory.  And I'm curious to

24   hear from both sides.

25        So the plaintiff alleges in the Complaint, paragraph 77,

1  that the use of a wheelchair is a proxy for disability.  And I

2  guess the question is why is that not an under-inclusive proxy

3  within the meaning of *Schmitt*?  What's the tightness of the

4  nexus that you are claiming makes that a reasonable and not

5  under-inclusive proxy?

6          **MS. CENTER:**  I may be misunderstanding your question,

7  but from our point of view, virtually everyone who has a

8  medical need for a wheelchair -- every person with mobility

9  impairment who needs a wheelchair is disabled under 1557.

10          **THE COURT:**  But do all disabled people need

11  wheelchairs or a significantly large enough percentage of

12  disabled people need wheelchairs?  That's what I understand

13  this under-inclusiveness question to be focused on.  Maybe you

14  can help me understand what -- what you think the *Schmitt* court

15  was talking about when it talked about under-inclusive and

16  over-inclusive, but that's how I read it.

17          **MS. CENTER:**  I don't recall the *Schmitt* case looking

18  at under-inclusiveness in that way.  They didn't, I don't

19  think, look at the universe of disabled people and say how many

20  are hearing impaired --

21          **THE COURT:**  Well, that's exactly what they did.  "At

22  the same time, Schmitt and Mohundro's alleged proxy is

23  under-inclusive because it excludes hearing-disabled

24  individuals who require or will require treatment associated

25  with cochlear implants."

1    **MS. CENTER:**  Okay.  So that's still -- it's still the

2    category of people with hearing disabilities.

3    **THE COURT:**  Well, and it says, "Kaiser covers cochlear

4    implants and related services, and some proportion of

5    hearing-disabled insureds can meet their treatment needs

6    through cochlear implants alone.  We are left to guess what

7    that proportion might be."

8    **MS. CENTER:**  Well, in our case --

9    **THE COURT:**  And then just finishing up: "If cochlear

10   implants serve the needs of most individuals with hearing

11   disability, that fact would tend to undermine a claim of proxy

12   discrimination."

13   So just granularly, how does this apply to your case?  It

14   seems to me they've given me the test.  How do I apply it, in

15   your view, to your facts?

16   **MS. CENTER:**  So people with mobility disabilities who

17   cannot walk -- we have wheelchairs and then I don't know that

18   we have anything else.  It's not like we have cochlear implants

19   and hearing aids.  Wheelchairs is the main way that people with

20   significant mobility impairments are mobile.

21   **THE COURT:**  I guess theoretically something like

22   crutches would be a substitute, for example.  Why is -- why,

23   based on the way that it's pled and your theory -- why is that

24   nonetheless not relevant?

25   **MS. CENTER:**  Well, it doesn't need to be a perfect

1    fit, but I do think that, you know, the class that we seek to

2    represent are people who need wheelchairs, and there's really

3    no other -- you know, for people with that level of mobility

4    disability, there is not some other thing that, you know,

5    Kaiser's providing that creates any -- any meaningful access to

6    the habilitative and rehabilitative services.

7        **THE COURT:**  All right.  And then another thing that

8    the *Schmitt* court said in this discussion of under-inclusivity

9    is that "A Section 1557 plaintiff cannot define the benefits so

10   narrowly as to require an insurer to curate coverage for each

11   individual's healthcare needs."

12       In your view, why does your definition do that or avoid

13   that problem?

14       **MS. CENTER:**  Well, I think that under the meaningful

15   access standard, what plaintiffs are seeking are wheelchairs

16   that are medically necessary, wheelchairs that meet the

17   standard of care.  You know, we are seeking access that fits

18   the meaningful access standard meaning there's a balance

19   between the disability non-discrimination mandate and the needs

20   of the benefit program, and, you know, the benefit program can

21   engage in reasonable cost sharing, but just to have it not on

22   the list at all we say is disability discrimination.

23       **THE COURT:**  All right.

24       And then I'll turn to counsel for the State and ask you

25   the flip side of the question, which is why is -- why isn't it

1    at least plausible that use of a wheelchair is an appropriate

2    and tailored proxy for mobility impairment disability?

3          **MR. SONDHEIMER:**   Certainly, Your Honor.   I'll endeavor

4    to respond to that.

5          I would just note that, particularly if nothing else given

6    the space limitations for our -- for our briefs, we did not

7    focus on that issue and understood that our motion would be

8    considered in tandem with Kaiser's, and I know that they --

9    they did brief that -- this particular issue more extensively

10   than we did.

11         But with respect to that, Your Honor, yes, we do believe

12   that the -- it's not a close fit because wheelchairs are not

13   necessarily a proxy for all mobility disabilities, as you

14   noted.   Persons with mobility impairments can get around by

15   crutches or, as my mother-in-law did recently, on scooters.

16   There are other mobility devices that may serve the needs of

17   people with either permanent or even temporary disabilities.

18         And I think plaintiffs have suggested that any mobility

19   impairment of any kind or duration, they -- they deem a

20   disability, but I know Kaiser has cited the authority in their

21   papers, but it's not the case under the law that a temporary

22   disability is necessary -- is -- constitutes a disability for

23   purposes of federal disability law.

24         So -- so the -- the wheelchair is -- is a -- both

25   over-inclusive as well as under-inclusive proxy for -- for

1  disability.

2      THE COURT:  Before I -- let me -- I'll get one point

3  from your opposing counsel and then we'll come back.

4      Where -- Ms. Center, in the Complaint, where is the best

5  definition of the group of people that we're talking about as

6  the proposed putative class?

7      MS. CENTER:  My colleagues will provide that.

8      It would be that -- I know that we say in the Complaint

9  that people that are plaintiffs use their wheelchairs on a

10 day-to-day basis.  Our proposed class is people with

11 disabilities who need wheelchairs.  We say in the Complaint

12 that wheeled mobility devices make up the greatest proportion

13 of assistive devices in use.

14     THE COURT:  What paragraph is this?

15     MS. CENTER:  I'm hoping my colleagues can get it for

16 me.

17     Paragraph 22 is the class definition.

18     THE COURT:  All right.  I see.  Although -- and for

19 reasons I can understand, that definition is self-referential

20 to wheelchairs.

21     MS. CENTER:  Right.

22     THE COURT:  It is folks who need a wheelchair or

23 wheelchair repair.

24     But don't I still, under *Schmitt*, need to try to figure

25 out whether there is an under-inclusive or over-inclusive

1  definition for purposes of the discrimination-by-proxy claim?

2  I guess that's the question.  Obviously you've defined it in

3  terms of people who need wheelchairs, but doesn't that --

4  that's circular in some ways.

5         MS. CENTER:  Right.  So "An appropriate wheelchair is

6  the standard" -- this is paragraph 39 in our Complaint.  "An

7  appropriate wheelchair is the standard of care for people with

8  disabilities who cannot walk or have difficulty walking."

9         THE COURT:  All right.  I see.

10        And so given that allegation, Mr. Sondheimer, why isn't it

11 at least plausible at the Rule 12(b)(6) stage that most people

12 with mobility impairments of that sort can't meet their

13 treatment needs without wheelchairs?

14        MR. SONDHEIMER:  Your Honor, if I may, I -- I'd like

15 to just look at the language there, if I may, before I respond.

16        THE COURT:  Sure.

17        (Pause in proceedings.)

18        MR. SONDHEIMER:  And -- I apologize, Your Honor.  The

19 question is, is why is that not a -- a close --

20        THE COURT:  Right.

21        MR. SONDHEIMER:  -- proxy --

22        THE COURT:  What's under-inclusive about it given that

23 it seems to me at least a plausible allegation at the motion to

24 dismiss stage that most people with mobility impairment of the

25 level described in that paragraph, 39, can't meet their

1   treatment needs with substitutes; that they need wheelchairs.

2   Why does this allegation not defeat the -- certainly the claim

3   of under-inclusiveness in terms of the proxy analysis?

4           MR. SONDHEIMER:  It -- well, I'm sorry, Your Honor.

5   If I'm understanding the question, it appears over-inclusive --

6   that definition appears over-inclusive for reasons that I

7   mentioned, because there are persons who cannot walk or have

8   difficulty walking as identified here that -- in which -- you

9   know, for whom other technologies, other -- other ways of

10  mobility may be appropriate.

11          THE COURT:  All right.  In your view, in assessing the

12  plausibility of the allegation, which is all I'm looking at in

13  a motion to dismiss, you think that that is so flawed as to be

14  implausible as a matter of law?

15          MR. SONDHEIMER:  Well, I think when we're talking

16  about -- when we're talking about is this being used as a proxy

17  for disability discrimination, I -- I think it is implausible.

18      And, Your Honor, I -- one point that I wanted to add is

19  that when you asked me about the *Schmitt* analysis, one -- one

20  issue that I guess I was thinking about when you were asking me

21  about whether your characterization of the differences, you

22  know, makes sense under *Schmitt* is that I think under --

23  whether the Court's looking at intentional affirmative intent

24  or a proxy discrimination sort of theory, there does need to be

25  something more than the exclusion itself, even under -- under a

1  proxy discrimination theory.

2      The Court noted that -- that proxy discrimination requires

3  a plaintiff to prove also facts giving rise to an inference of

4  intentional discrimination besides the exclusion itself.

5  That's at page 959 of the decision.

6      So I think there does in a proxy discrimination claim,

7  whether it's -- it doesn't necessarily have to be proof of the

8  intent, but there has to be something that would allow the

9  Court to make a plausible inference that indeed the selection

10 of this proxy is -- is -- is a basis for discrimination.

11     And I guess it's relevant to note, too, that there is no

12 affirmative exclusion of wheelchairs.  Wheelchairs are not

13 identified, but -- particularly to the extent that -- that

14 the -- that the essential health benefits are minimum

15 requirements, there's been no affirmative exclusion of

16 wheelchair coverage.

17     So I think that the proxy theory is also not a close fit

18 for demonstrating discrimination in this instance.

19         **THE COURT:**  Do you agree with that, that there's not

20 an affirmative exclusion of wheelchair coverage?

21         **MS. CENTER:**  No, Your Honor.  I think that there's a

22 list of very specific DME, and wheelchairs are conspicuously

23 absent.  People with wheelchair -- people who use wheelchairs

24 have, you know -- it's long been the intent of all of our

25 federal disability civil rights laws to protect people who use

1    wheelchairs.  The federal government has identified people with

2    paralysis and people with missing limbs as targeted

3    disabilities because they face such high levels of unemployment

4    and other barriers.  So I disagree that there is not an

5    exclusion.

6              **MR. SONDHEIMER:**  Your Honor, if I may, the Kaiser

7    plans at issue in the plaintiffs' claims against Kaiser include

8    wheelchair coverage, so there certainly is not any affirmative

9    exclusion of a plan from offering wheelchair coverage.

10             **THE COURT:**  Yeah.  As I listened to the explanation

11   and the phrase "conspicuously absent," again, that just seems

12   to be nothing more than it's not included.

13        All right.  Well, interesting deep dive into *Schmitt*, a

14   case I had never heard of before getting these motions.

15        I think I have a good understanding of the parties'

16   arguments, and I'll plan to take it under submission.  If I do

17   want any supplemental briefing on the sovereign immunity

18   question, I'll let you know, but otherwise, if you don't hear

19   from me, consider it submitted.

20        And I do think let's skip the case management conference

21   for now.  Given that we've got this substantial question as to

22   whether the case will go forward and whether it will go forward

23   against this defendant or potentially a question of an

24   amendment, I think it probably makes sense to table the case

25   management conference for the time being and then circle back

1   to that once I've had a chance to resolve this issue.

2           **MS. CENTER:**  Your Honor, may I just consult with my

3   colleagues just one moment before we close?

4           **THE COURT:**  Sure.

5           (Pause in proceedings.)

6           **THE COURT:**  All right.  Anything further for today?

7           **MS. CENTER:**  No, Your Honor.

8           **MR. SONDHEIMER:**  Your Honor, I just would like to

9   offer, since we have counsel for Kaiser here, there are two

10  points that came up that they might be able to help the -- help

11  explain to the Court.

12          First of all, as to the issue we were just discussing

13  about whether there is an exclusion, as I mentioned, the Kaiser

14  policy at issue certainly has coverage of wheelchairs.  It's

15  just a limitation on that.  And counsel for Kaiser can speak

16  to, you know, specifically the nature of the coverage provided

17  under their plan.

18          As I also mentioned, they, in their briefing, addressed

19  the issue of the -- the fit of wheelchairs as proxy

20  discrimination and, as I think I indicated, could speak more

21  eloquently than I could about the over- and under-inclusive

22  nature of the plaintiffs' proxy claim.

23          **THE COURT:**  Okay.  Well, on those two points, you

24  know, again, it's a 12(b)(6) motion, so they can address the

25  allegations that are in the Complaint, and really I'm focused

1   on the four corners.

2          On the second, Kaiser is hoping to be off to arbitration

3   so I may not need to get to the merits of their motion to

4   dismiss, but I do think that I understand the issues

5   sufficiently well to submit that and make a decision on it.

6          **MS. CENTER:**  And, Your Honor, in *Schmitt* there was an

7   opportunity -- once the Ninth Circuit decided the fit wasn't

8   quite close enough, they were given the opportunity to amend.

9          **THE COURT:**  All right.  Fair enough.

10          Okay.  Thanks very much to you both.

11                 (Proceedings adjourned at 2:53 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                          CERTIFICATE OF REPORTER

4          I certify that the foregoing is a correct transcript

5   from the record of proceedings in the above-entitled matter.

6

7   DATE:  Monday, May 23, 2022

8

9   *Pamela Batalo Hebel*

10  Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
    U.S. Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25