UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GRACE SMITH, et al.,

Plaintiffs,

v.

CALIFORNIA DEPARTMENT OF
MANAGED HEALTH CARE, et al.,

Defendants.

Case No. 21-cv-07872-HSG

**ORDER DENYING DEFENDANTS'
MOTION TO DISMISS, GRANTING IN
PART AND DENYING IN PART
PLAINTIFFS' REQUEST FOR
JUDICIAL NOTICE, AND GRANTING
DEFENDANTS' REQUESTS FOR
JUDICIAL NOTICE**

Re: Dkt. Nos. 34-1, 77, 81, 83

Pending before the Court is the Motion to Dismiss the Second Amended Complaint ("SAC") filed by the California Health and Human Service Agency and the Department of Managed Health Care ("Defendants"). *See* Dkt. No. 77. The Court finds this matter appropriate for disposition without oral argument and the matter is deemed submitted. *See* Civil L.R. 7-1(b). For the reasons discussed below, the Court **DENIES** the motion, Dkt. No. 77. The Court relatedly **GRANTS in part and DENIES in part** Plaintiffs' associated request for judicial notice, Dkt. No. 81, and **GRANTS** Defendants' requests for judicial notice, Dkt. Nos. 34-1, 83.

I. **BACKGROUND**

The plaintiffs in this case are two disabled individuals and the nonprofit California Foundation for Independent Living Centers ("CFILC"), an "organization that serves and supports more than twenty Independent Living Centers across the state and leads several state-wide programs for Californians with disabilities." SAC ¶¶ 3, 4. Plaintiffs initially filed this putative class action lawsuit on October 7, 2021, alleging that Kaiser Foundation Health Plan, Inc. ("Kaiser"), the Department of Managed Health Care ("DMHC"), and DMHC Director Mary Watanabe unlawfully excluded or limited coverage for wheelchairs in the California EHB-

United States District Court
Northern District of California

Benchmark plan ("the Plan"). [1] Plaintiffs filed an amended complaint the following month, Dkt. No. 12, which state defendants moved to dismiss, Dkt. Nos. 33 and 34, and defendant Kaiser moved to compel to arbitration, Dkt. No. 32. On September 27, 2022, the Court issued two orders: one granting Kaiser's motion to compel arbitration, Dkt. No. 66, and the other granting state defendants' motion to dismiss the complaint on the ground that suit against DMHC and Director Watanabe was barred under the doctrine of sovereign immunity. *See* Dkt. No. 67 ("MTD I Order"). The Court granted Plaintiffs leave to amend. *Id.*

On October 25, 2022, Plaintiffs filed the SAC, dropping Director Watanabe and adding the California Health and Human Services Agency ("CHHSA") as a named defendant. [2] *See* Dkt. No. 67 ("SAC"). As before, Plaintiffs allege that Defendants' exclusion of, or unreasonable limitation on, wheelchair coverage in the Plan discriminates against people with disabilities in violation of Section 504 of the Rehabilitation Act and Section 1557 of the Affordable Care Act ("ACA").

---

[1] The Court provided additional background on the benchmark approach to insurance coverage under the ACA in its prior order. *See* Dkt. No. 67 ("MTD I Order") at 1–2. In that order, the Court did not have occasion to rule on Defendants' request, Dkt. No. 34-1, for judicial notice of (1) the California EHB-Benchmark plan document and (2) the letter from the Secretary of the California Health and Human Service Agency transmitting that plan to the agency's national counterpart upon selection. However, because Defendants' second Motion to Dismiss appears to renew this request, the Court now rules on it. *See* Dkt. No. 77 at 8 ("The motion will be and is based on . . . the previously filed . . . Request for Judicial Notice (ECF 34-1)"). Judicial notice "permits a court to notice an adjudicative fact if it is 'not subject to reasonable dispute,'" which means the fact is "'generally known,' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (quoting Fed. R. Evid. 201(b)). Additionally, where a plaintiff's claim "necessarily relies" on a document of unchallenged authenticity that was not physically attached to the complaint, a court may construe the document as part of the complaint on a motion to dismiss. *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006). The cover letter and Plan document proffered by Defendants are foundational to Plaintiffs' claims and were part of a public agency's governmental communications, and not reasonably susceptible to dispute about accuracy or authenticity. Accordingly, the Court **GRANTS** Defendants' request for judicial notice of the agency cover letter and Plan document, Dkt. No. 34-1, to the extent that these documents contain undisputed facts about the existence and terms of Plan coverage.

[2] The Complaint and First Amended Complaint also included allegations against Kaiser Foundation Health Plan, Inc. ("Kaiser"), *see* Dkt. Nos. 1, 12, but the SAC did not. Defendants query whether this omission indicates that Kaiser has been dropped from the case, but Plaintiffs confirm that claims against Kaiser are omitted "only because the claims against them cannot be litigated in this forum now during the pendency of the stay." Dkt. No. 80 at 1, n.1. Though for simplicity the Court refers throughout this order to CHHSA and DMHC as "Defendants," the Court recognizes that Kaiser remains a defendant in this case, and from the most recent arbitration status report, the Court understands that Plaintiffs and Kaiser commenced arbitration on March 26, 2023, and face a deadline of October 28, 2024 for the receipt of the arbitration award. *See* Dkt. No. 85 at 2.

SAC ¶¶ 68–82.  Defendants then filed this motion arguing that Plaintiffs' SAC should be dismissed because i) sovereign immunity bars suit against both Defendants; ii) Plaintiffs lack standing; iii) Plaintiffs' claims are time-barred; and iv) Plaintiffs fail to state a claim for disability discrimination.  Dkt. No. 77 ("Mot.").

## II.   LEGAL STANDARD

### A.   Rule 12(b)(1)

A motion to dismiss filed pursuant to Rule 12(b)(1) is a challenge to the court's subject matter jurisdiction.  *See* Fed. R. Civ. P. 12(b)(1).  "Federal courts are courts of limited jurisdiction[,]" and it is "presumed that a cause lies outside this limited jurisdiction."  *Kokkonen v. Guardian Life Ins. of Am.*, 511 U.S. 375, 377 (1994).  The party invoking the jurisdiction of the federal court bears the burden of establishing that the court has subject matter jurisdiction to grant the relief requested.  *Id.*  The issue of Article III standing is jurisdictional and is therefore "properly raised in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1)[.]"  *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).

Rule 12(b)(1) motions to dismiss based on an asserted lack of subject matter jurisdiction may be "facial" or "factual."  *See White*, 227 F.3d at 1242.  In a facial attack, the jurisdictional challenge is confined to the allegations pled in the complaint.  *See Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004).  The challenger asserts that the complaint's allegations are insufficient "on their face" to invoke federal jurisdiction.  *Safe Air Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  To resolve this challenge, the court assumes that those allegations are true and draws all reasonable inference in favor of the party opposing dismissal.  *See Wolfe*, 392 F.3d at 362.

On the other hand, where the jurisdictional attack is factual, "'the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction.'"  *Wood v. City of San Diego*, 678 F.3d 1075, 1083 n.8 (9th Cir. 2012) (quoting *Safe Air*, 373 F.3d at 1039).  Once challenged, the plaintiff must support her jurisdictional allegations with "competent proof."  *Hertz Corp. v. Friend*, 559 U.S. 77, 96–97 (2010).  To resolve a factual attack, the court need not "presume the truthfulness of the plaintiff's allegations" in the complaint and "'may

3

1    review evidence beyond the complaint without converting the motion to dismiss into a motion for

2    summary judgment.'" *Wood*, 678 F.3d at 1083 n.8 (quoting *Safe Air*, 373 F.3d at 1039); *see also*

3    *Land v. Dollar*, 330 U.S. 731, 735 n.4 (1947) ("[W]hen a question of the District Court's

4    jurisdiction is raised . . . the court may inquire by affidavits or otherwise, into the facts as they

5    exist.").  However, where "'the jurisdictional issue and substantive claims are so intertwined that

6    resolution of the jurisdictional question is dependent on factual issues going to the merits, the

7    district court should employ the standard applicable to a motion for summary judgment.'"  *Autery*

8    *v. United States*, 424 F.3d 944, 956 (9th Cir. 2005) (quoting *Rosales v. United States*, 824 F.2d

9    799, 803 (9th Cir.1987)).

10       **B.    Rule 12(b)(6)**

11           Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain

12    statement of the claim showing that the pleader is entitled to relief."  *See* Fed. R. Civ. P. 8(a)(2).

13    A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be

14    granted under Rule 12(b)(6).  "Dismissal under Rule 12(b)(6) is appropriate only where the

15    complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."

16    *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  To survive a Rule

17    12(b)(6) motion, a plaintiff need only plead "enough facts to state a claim to relief that is plausible

18    on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible

19    when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that

20    the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

21           In reviewing the plausibility of a complaint, courts "accept factual allegations in the

22    complaint as true and construe the pleadings in the light most favorable to the nonmoving party."

23    *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  Nevertheless,

24    courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of

25    fact, or unreasonable inferences."  *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir.

26    2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

27           Even if the Court concludes that a 12(b)(6) motion should be granted, the "court should

28    grant leave to amend even if no request to amend the pleading was made, unless it determines that

United States District Court
Northern District of California

4

the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (quotation omitted).

## III.    DISCUSSION

### C.    Sovereign Immunity

#### i.    Factual Background

In its prior ruling, the Court held that DMHC did not waive its sovereign immunity because Plaintiffs did not adequately allege that 1) DMHC was currently receiving any direct federal funding that could subject it to suit, and 2) the receipt of federal funding by a sister department within CHHSA could be imputed to DMHC so as to abrogate its immunity.  MTD I Order at 5–9.[3]  However, the Court permitted Plaintiffs to amend their complaint.

When they did so, Plaintiffs kept DMHC and added CHHSA as a defendant to the suit. *See generally* SAC.  But Defendants argue in their motion that Plaintiffs' amended pleadings still do not demonstrate CHHSA's present receipt of federal funds – let alone the imputation of any associated waiver from CHHSA to DMHC – sufficient to now allow Plaintiffs' claims to overcome the Eleventh Amendment bar.  Mot. at 18–22.  Plaintiffs contend that CHHSA has waived its sovereign immunity by its recent receipt of federal assistance, and that CHHSA's waiver is imputable to DMHC under *Sharer v. Oregon*, 581 F.3d 1176, 1180 (9th Cir. 2009).  Dkt. No. 80 ("Opp.") at 8–14.  While it is a close question, the Court ultimately finds, after considering both parties' factual contentions, that Plaintiffs have adequately alleged that CHHSA's receipt of federal funds waives its sovereign immunity, and that CHHSA's waiver is imputable to DMHC.[4]

#### ii.    Legal Framework

The Eleventh Amendment to the U.S. Constitution embodies the principle of "sovereign immunity" and bars a federal court from hearing claims by private citizens against state governments, their agencies, or the officials of those agencies unless the state consents to suit, or

---

[3] For ease of reference, the Court refers to the PDF pages rather than the document's internal pagination unless otherwise noted.
[4] Plaintiffs also continue to argue that Defendant DMHC is independently covered by Section 504 and Section 1557.  Opp. at 14.  The Court already rejected this argument in its prior order on Defendants' first motion to dismiss, and finding no new facts or arguments advanced that would affect that analysis, does so again here.  *See* MTD I Order at 6–7.

1  Congress has expressly abrogated the state's immunity.  *See Seminole Tribe v. Florida*, 517 U.S.

2  44, 54–57 (1996); *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S.

3  666, 669–70 (1999).

4       As the Court previously explained, one way for an otherwise immune sovereign entity to

5  consent to suit is by accepting federal funding that was conditioned on a waiver of that immunity.

6  MTD I Order at 5; *see Holley v. California Dep't of Corr.*, 599 F.3d 1108, 1111-12 (9th Cir.

7  2010).  To constitute a valid waiver of sovereign immunity, a state's consent to suit must be

8  "unequivocally expressed in the statutory text."  *Id*. (citations omitted).  But even a valid waiver

9  based on the acceptance of federal funds "encompasses a department or agency receiving federal

10  funds in *only* those periods during which the funds are accepted."  *Sharer*, 581 F.3d at 1180

11  (emphasis added); MTD Order I at 6–7. [5]

12       Both Sections 504 and 1557 express this clear waiver.  *See* Opp. at 8–9; *see also Douglas

13  v. California Dep't of Youth Auth.*, 271 F.3d 812, 820–21 (9th Cir.) (discussing waiver under

14  Section 504), *amended*, 271 F.3d 910 (9th Cir. 2001); *Espino v. Regents of the Univ. of California*,

15  No. 222CV05880SPGJPR, 2023 WL 3549464 at *12 (C.D. Cal. Mar. 31, 2023) (discussing

16  waiver under Section 1557).  Specifically, the statutes subject to suit "any program or activity"

17  any part of which is extended federal funds.  29 U.S.C. § 794(b) (Rehabilitation Act); 42 U.S.C. §

18  18116(a) (ACA).  Significantly, the Rehabilitation Act defines "program or activity" to mean "all

19  the operations of" a given covered entity.  29 U.S.C. § 794(b).

20       **iii.    Application to CHHSA**

21       Defendants argue that Plaintiffs have not "establish[ed] that . . . CHHSA has waived its

22  Eleventh Amendment immunity through receipt of federal funding" because they "fail to allege

23  any facts actually showing that" CHHSA receives federal funds.  Mot. at 21.  Even though they

24  did not submit additional evidence with their motion, the Court construes Defendants' argument as

25  _____

26  [5] This aspect of the *Sharer* court's discussion was limited to Section 504, as it did not have section
1557 claims in front of it (nor could it have, since the case predated the ACA).  However, this

27  Court sees no reason that *Sharer*'s holding should not apply to Section 1557 claims, and the
parties do not furnish any.  As such, the Court finds that like Section 504 claims, Section 1557

28  claims against an immune sovereign are allowed only during the period(s) in which that entity
accepts federal funds.

United States District Court
Northern District of California

1    a factual Rule 12(b)(1) challenge to Plaintiffs' jurisdictional allegations. *See Wood*, 678 F.3d at

2    1083. Plaintiffs therefore bear the burden of showing "competent proof" that the Court properly

3    has jurisdiction over CHHSA. *Hertz Corp.*, 559 U.S. at 96–97.

4         Plaintiffs aver in their complaint that CHHSA "receives billions of dollars of federal

5    financial assistance each year." SAC ¶ 29. To support this allegation once challenged, Plaintiffs

6    submit state budget documents along with their opposition. Of most relevance, they provide a

7    2021-2022 CHHSA Budget Report (Dkt. No. 81-1, Ex. 1) and an excerpt from a California

8    Manual of State Funds (Dkt. No. 81-2, Ex. 2).[6] The 2021-2022 budget document prominently

9    states "Health and Human Services" on its first title page and in the upper margin on every page

10   after that, and details the budgets and funding sources for CHHSA's subsidiary departments and

11   entities. Notably, each line item in the budget is associated with a specific funding code. To

12   orient the Court to the most relevant funding code, Plaintiffs use the Manual of State Funds to

13   show that code "0890 Federal Trust Fund" refers to the state account "for the deposit of all

14   moneys received by the state from the federal government where the expenditure is administered

15   through or under the direction of any state agency." Dkt. No. 81-2, Ex. 2 at 2. Plaintiffs request,

16   and the Court grants, judicial notice of these two documents.[7] Dkt. No. 81. It further uses these

17   _____

18   [6] The Court notes that Plaintiffs label these two exhibits inconsistently. In their request for
     judicial notice, Plaintiffs discuss Exhibit 1 and 2, *see* Dkt. No. 81, but the cover pages of Dkt. Nos.
19   81-1 and 81-2 identify the documents as "Exhibit 10" and "Exhibit 11," respectively. For clarity,
     the Court will refer to them as Exhibits 1 and 2, as Plaintiffs do in their discussion.
20   [7] The two documents at issue (Dkt. Nos. 81-1, Ex. 1 (CHHSA budget); 81-2, Ex. 2 (manual
     excerpt)) are public records, the authenticity of which Defendants do not challenge. Accordingly,
21   the Court finds it appropriate to take judicial notice of undisputed facts within those documents
     under *Khoja*, and **GRANTS** Plaintiffs' request as to these documents. *Khoja*, 899 F.3d at 999.
22   However, to resolve the factual dispute at hand, the Court must grapple not only with the
     undisputed facts (e.g. that DHCS's budget has a line item of $84,094,146 [in thousands] from
23   funding account "0890 Federal Trust Fund," *see* Dkt. No. 81-1, Ex. 1 at 57), but also inferences
     arising out of those facts (e.g. that DHCS received more than $84 billion in federal funds during
24   the 2021-22 budget cycle). In the absence of declarations from either side spelling out these
     inferences, the Court looks to the parties' own treatment of the budget documents. For example,
25   Defendants, based on the funding accounts represented in the budget, observe that "DMHC's
     funding appears to come from the Managed Care Fund." Reply at 8. And Plaintiffs, in their
26   Request for Judicial Notice, observe that the budget documents show that "several health
     programs and activities operated by HHSA and DHCS are funded from the state's Federal Trust
27   Fund." Dkt. No. 81 at 3. These and other instances demonstrate the parties' shared assumption
     that it is reasonable to read the budget documents as reliably representing (1) the flow of actual
28   money, (2) the departmental recipient of that money, and (3) the source (i.e. funding account) of
     that money. Since neither party has challenged these premises, and the Court finds them

1  documents to resolve the factual dispute raised by Defendants.  *See Land*, 330 U.S. at 731 n.4.

2        In reviewing the budget documents, the Court concludes that Plaintiffs have provided

3  "competent proof" to support their allegation that CHHSA "receives billions of dollars of federal

4  financial assistance each year."  SAC ¶ 29.  Of the 20 entities accounted for in the budget

5  document (which, again, is identified with CHHSA by its coversheet and on the top margin of

6  every page), the Court identifies twelve CHHSA entities that received funds from "0890 Federal

7  Trust Fund."[8]  *See generally* Dkt. No. 81-1, Ex. 1.  By the Court's math, those federal funds –

8  which, per the Manual of Funds, are "administered through or under the direction of any state

9  *agency*" – totaled over $97.5 billion dollars in the 2021-2022 budget cycle.  Dkt. No. 81-2, Ex. 2

10  at 2 (emphasis added).  While the federal money might ultimately flow to CHHSA departmental

11  subsidiaries, the definition of the "0890" funding account in the Manual of Funds tethers funding

12  flowing from that account to the *agency*, which in this case is CHHSA.  The Court is of the view

13  that taken together, these facts are sufficient to support Plaintiffs' allegations regarding CHHSA's

14  receipt of federal funds.  But should any doubt linger, the Court further observes that the budget

15  document provided by *Defendants* (and judicially noticed by the Court, *see* n.10) shows that

16  CHHSA *itself* (i.e. for its specific agency functions) received federal funds in the 2021-2022

17  budget cycle.  *See* Dkt. No. 83 at 4.  According to this document, CHHSA received more than $13

18

19  _____

reasonable, it will rely on them in resolving the jurisdictional challenge.  If Defendants
substantively dispute any inferences made by the Court in reviewing the budget documents
presented (namely, that they accurately represent the flow, source, and departmental recipient of
funds, including federal funds demarcated by the "0890 Federal Trust Fund" funding account
code), they can raise that argument on summary judgment.

[8] Based on the Court's review of the budget document Plaintiffs provided, it infers that the
following CHHSA entities received federal funding from the "0890 Federal Trust Fund" account
during the 2021-22 budget cycle: State Council on Developmental Disabilities (Dkt. 81-1, Ex. 1 at
4), Emergency Medical Services Authority (*id*. at 7), Office of Statewide Health Planning and
Development (*id*. at 15), Department of Aging (*id*. at 32), Commission on Aging (*id*. at 43),
Department of Health Care Services (*id*. at 58), Department of Public Health (*id*. at 95),
Department of Developmental Services (*id*. at 141), Department of Community Services and
Development (*id*. at 170), Department of Rehabilitation (*id*. at 178), Department of Child Support
Services (*id*. at 188), and Department of Social Services (*id*. at 194).  The Court further infers that
the following entities did not receive federal funding from the "0890 Federal Trust Fund" during
that budget cycle: Department of Managed Health Care, California Senior Legislature, California
Children and Families Commission, Department of State Hospitals, Mental Health Services
Oversight and Accountability Commission, California Health Benefit Exchange, State
Independent Living Council, and State-Local Realignment, 1991.

United States District Court
Northern District of California

1   million dollars that funding cycle from "0890 Federal Trust Fund," which was applied to the

2   "0280 Secretary of California Health and Human Services" program code.  *Id*. at 4, 7.

3        Since the CHHSA budget documents appear to show that CHHSA receives federal funds

4   not only for the functions of at least a dozen of its subsidiary entities but also for its specific

5   agency functions, the Court concludes that Plaintiffs' allegations concerning CHHSA's receipt of

6   federal funds have evidentiary support.  At this stage and on these facts, the Court finds that

7   CHHSA receives federal funds sufficient to waive its sovereign immunity, such that the Court has

8   jurisdiction over Plaintiffs' claims against CHHSA.

9          **iv.**    **Application to DMHC**

10        Since Plaintiffs' suit involves not just CHHSA but also DMHC – a department the Court

11   previously ruled does not itself currently receive federal funds, *see* MTD Order I at 8–9 –

12   Plaintiffs must show that imputing CHHSA's waiver of sovereign immunity to DMHC is proper.

13   Plaintiffs contend that because DMHC is a part of an agency that receives federal funds, Sections

14   504 and 1557 apply based on the statutory definitions.  The Rehabilitation Act covers "programs

15   or activities receiving federal financial assistance," and defines "programs or activities" to mean

16   "all the operations of" a department or agency, "*any part of which*" receives federal funds.  29

17   U.S.C. § 794 (emphasis added).  Similarly, the ACA extends to "any health program or activity,

18   *any part of which* is receiving federal financial assistance."  42 U.S.C. § 18116 (emphasis added).

19   Since by virtue of being a subsidiary department, DMHC is a part of the operations of CHHSA –

20   an agency that receives federal funds – Plaintiffs reason that DMHC has plainly waived immunity

21   based on the statutory text.  Opp. at 9–10, 12–13.

22        Defendants disagree. Relying on *Sharer*, they argue that Plaintiffs' read of "program and

23   activity" is overbroad.  Mot. at 19–20; Dkt. No. 82 ("Reply") at 6–9.

24        The Court, based on *Sharer*'s instruction to "interpret 'program or activity' broadly," 581

25   F.3d at 1178, finds Plaintiffs' statutory argument persuasive, but turns to *Sharer* to assess the

26   ultimate soundness of imputing CHHSA's waiver to DMHC.  In that case, Lois Sharer, a former

27   employee of Oregon's Office of Public Defense Services ("OPDS"), brought a disability

28   discrimination suit against the State of Oregon and her former bosses under Section 504 and other

provisions.  *Id.* at 1176.  Defendant argued at the summary judgment stage that even though the judicial branch within which OPDS was located received federal funds, Sharer had not established that OPDS itself was a "program or activity receiving Federal financial assistance."  The district court agreed, and the Ninth Circuit affirmed.  In reaching that decision, the Ninth Circuit first analyzed whether Oregon's judicial branch could be considered a "unitary 'department' or 'agency' for section 504 purposes."  *Id.* at 1179.  It found it could not, observing that Oregon statutes referred to the "judicial department" (meaning "the judicial branch of government in its entirety") separately from two entities organized within it – the "Judicial Department" and the "Public Defense Services Commission" (of which OPDS was a subunit) – and that those two entities were themselves administratively "distinct."  *Id.*  Having determined that the "judicial department" was not "unitary," the Court next weighed whether the "Judicial Department" (which did receive federal funding) and the Commission (which did not) were "sufficiently independent from one another to constitute separate 'department[s]' or 'agenc[ies]' under section 504."  *Id.* at 1180.  It reasoned that because they had different funding sources and a separate leadership structure without overlapping supervision, they were separate entities for Section 504 purposes.  *Id.*  Accordingly, neither imputation of waiver from the "judicial department" to OPDS nor imputation from the "Judicial Department" to OPDS was permissible, and OPDS was immune from suit.  *Id.*

Naturally, Defendants argue that the facts here are sufficiently analogous to *Sharer* to warrant the same conclusion.  They contend that Plaintiffs have not "alleged a sufficient connection between DMHC and CHHSA that would permit them to be considered a single entity," and that DMHC and CHHSA are "are organized under different statues," "have different directors," and "have different sources of funding," such that waiver cannot be imputed from one entity to the other.  Mot. at 20; *see also* Reply at 7–9.  Plaintiffs, on the other hand, maintain that they have done enough to show this connection: in their SAC, they allege that CHHSA receives "federal financial assistance each year" such that its "programs and activities" – of which DMHC is one – "are subject to [] inclusion and anti-discrimination requirements."  SAC ¶ 29.  Plaintiffs additionally allege that DMHC is a "sub-department" of CHHSA, SAC ¶ 53, and that CHHSA

"oversees . . . all programs, services, and activities of [DMHC]" and "must approve DMHC's budget and seek to improve its organizational structure, operating policies, and management information systems." SAC ¶ 17 (citing Cal. Gov't Code § 12803(a); Cal. Health & Safety Code § 1341(a)). CHHSA's secretary, Plaintiffs argue, is bound to "hold responsible the head of DMHC for its administrative, fiscal, and program performance, and must periodically review DMHC's operations and evaluate its performance." *Id.* (citing Cal. Gov't Code § 12800(b)). Based on these allegations, Plaintiffs argue that it is proper to conclude that "Defendant DMHC is not an independent Commission that acts outside of [C]HHSA direction and authority," but is rather "a component of [CHHSA] and is under the agency's authority, jurisdiction, and supervision." Opp. at 11.

At this stage (notably an earlier one than was at issue in *Sharer*), the Court agrees with Plaintiffs. This case concerns the connections between a state agency (CHHSA) that receives federal assistance and a subordinate department (DMHC) that does not. While *Sharer* stands for the proposition that one agency's hierarchical subordination to another does not alone justify imputing waiver, Plaintiffs have pointed to the statutes just recited to suggest that DMHC and CHHSA are connected by more than their "nominal" positions on an organizational chart. SAC ¶¶ 17, 29, 53; Reply at 7.

Given that a key part of the *Sharer* analysis involved examining the supervisorial structure of the subunit, it is significant in the Court's view that the CHHSA secretary is "responsible for the sound fiscal management of each department . . . within [CHHSA]," including DMHC. Cal. Gov. Code § 12800(b). To carry out that responsibility, the secretary must "review and approve the proposed budget of each department," "hold the head of each department . . . responsible for management control over the [department's] administrative, fiscal, and program performance," "review the operations and evaluate the performance at appropriate intervals of each department," and "seek continually to improve the organization structure, the operating policies, and the management information systems of each department." *Id.* Though the Court recognizes that department directors are also endowed by statute with significant responsibilities – namely "the performance of all duties, the exercise of all powers and jurisdiction, and the assumption and

11

1    discharge of all responsibilities vested by law in the department" – that does not displace, at least

2    for purposes of the assessing this Rule 12(b) challenge, the CHHSA secretary's statutory

3    obligations to carry out administrative and programmatic oversight of DMHC departmental

4    activities.  Cal. Health & Safety Code § 1341(c).  This dynamic differs appreciably from *Sharer*,

5    where, in part because the Commission "was not subject to the exercise of administrative authority

6    and supervision by the Chief Justice," the entities were deemed independent.  *Sharer*, 581 F.3d at

7    1180.[9]

        In the absence of argument from Defendants as to how the entities' codification in different

9    California codes and funding from different sources demonstrates functional (rather than on-

10   paper) independence, the Court is not persuaded at this stage and as a matter of law that DMHC is

11   independent enough from CHHSA to constitute a separate "department" or "agency" under

12   Section 504 considering the secretary's statutory programmatic and administrative oversight role.

13   [10]  In reaching this conclusion, the Court finds relevant that the state agency at issue here is not

14   coextensive with an entire multi-purpose branch of government, as it was in *Sharer*.  Rather,

15   CHHSA is a discrete agency within the executive branch focused on advancing health and human

16   services through the functions of the departments (like DMHC) under its purview, such that

17   DMHC is arguably a part of this agency's "program[s] or activit[ies]."  29 U.S.C. § 794(b)

18   (defining "program or activity").  So while the Court appreciates that sovereign immunity must

---

[9] To reach this conclusion, the Court did not need to rely on Exhibits 3, 4, 5, 6, 7, and 8 in Plaintiffs' Request for Judicial Notice.  *See* Dkt. No. 81 and Dkt. No. 81-3, Ex. 3; 81-4, Ex. 4; 81-5, Ex. 5; 81-6, Ex. 6; 81-7, Ex. 7; 81-8, Ex. 8.  As such, the Court **DENIES** Plaintiffs' Requests for Judicial Notice as to these documents.

[10] Defendants argue that CHHSA and DMHC are funded by different sources, and request that the Court take judicial notice of CHHSA's 21-22 State Budget to show that the "Managed Care Fund" is not among the listed funding source accounts for CHHSA.  Dkt. No. 83 at 3, Ex. A.  Like the documents discussed above at footnote 7, this is a public record of uncontested authenticity, so the Court **GRANTS** Defendants' request for judicial notice of certain undisputed facts in it.  *Khoja*, 899 F.3d at 999.  Specifically, the Court notes that the Managed Care Fund is not listed in the "Funding" section on page 4 of Dkt. No. 83.  Defendants additionally observe that a document urged as judicially noticeable by *Plaintiffs* – the CHHSA 2021-22 Budget Report discussed above – shows that the "bulk of DMHC's funding appears to come from the Managed Care Fund."  Reply at 8 (citing Dkt. No. 81-1).  The Court takes notice of that fact.  Dkt. No. 81-1, Ex. 1 at 28.  Finally, as also discussed above, the Court takes notice of the fact that CHHSA was budgeted to receive more than $13 million dollars from "0890 Federal Trust Fund" in the 2021-2022 budget cycle.  Dkt. No. 83 at 4.

not be imputed too readily, it does not find for purposes of this motion to dismiss that imputation in this instance offends that principle, especially where *Sharer* counsels that the Ninth Circuit "interpret[s] 'program or activity' broadly." *Sharer*, 581 F.3d at 1178. Here, the imputation of CHHSA's receipt of federal funds to a department under its supervision that advances the same substantive mandate "leaves unaffected both other state agencies and the State as a whole[,]" and does not contravene a state's prerogative to "avoid Section 504's waiver requirement on a piecemeal basis." *Jim C. v. United States*, 235 F.3d 1079, 1081 (8th Cir. 2000).

The Court accordingly **DENIES** Defendants' motion to dismiss Plaintiffs' complaint on sovereign immunity grounds.

### D. Standing

Defendants argue that Plaintiffs' allegations do not support standing because they have not established traceability and redressability. Mot. at 22–25. Plaintiffs counter that standing is proper, Opp. at 17–24, and the Court agrees.

To establish standing, a plaintiff must "present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling." *Davis v. Federal Election Comm'n*, 554 U.S. 724, 733 (2008). Though courts generally decline to "endorse standing theories that rest on speculation about the decisions of independent actors," where an injury is alleged to arise out of the "predicable actions of third parties who are responding to actions of government defendants," traceability as to those government defendants is not defeated. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2565–66 (2019). And redressability – a "relatively modest" requirement – can be shown where a favorable ruling would result in a "change in legal status," and where a "practical consequence of that change would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Renee v. Duncan*, 623 F.3d 787, 797–98 (9th Cir. 2010) (citations omitted), *opinion supplemented on reh'g*, 686 F.3d 1002 (9th Cir. 2012). In other words, a plaintiff need not "guarantee" that redressability would follow. *Id.*

Here, Plaintiffs have put forward a non-speculative causal chain for their injuries: Defendants promulgated the allegedly discriminatory Plan, which led predictably to Kaiser

excluding or imposing limits on wheelchair coverage, which caused Kaiser's denial of Plaintiffs' wheelchair benefits, which injured Plaintiffs. While Defendants argue that there is "no nexus" between Defendants' conduct and Plaintiffs' harm, Mot. at 23, Plaintiffs adequately allege that the promulgated regulations *are* that nexus, and that CHHSA acted through DMHC in taking this challenged action.[11] SAC ¶¶ 31, 53. The fact that Defendants codified and implemented these regulations at the direction of the legislature does not remove them from the causal chain, as Defendants seem to suggest. *Id.*

It also does not immunize them from challenge to their actions. Defendants reason that their role in merely "codifying" the legislature's benchmark plan defeats redressability. Mot. at 24–25. They argue that this Court cannot issue an order directing them to cover benefits the legislature declined to cover. *Id.* But in support of that position, they cite only to cases standing for the unremarkable propositions that federal courts cannot modify statutory terms while interpreting the plain text of a statute, or unilaterally amend state statutes. *Id.* (citing *Bostock v. Clayton Cty., Ga.*, 140 S. Ct. 1731, 1738 (2020); *Preskar v. U.S.*, 248 F.R.D. 576, 584 (E.D. Cal. 2008)). Plaintiffs ask this Court to do neither. Plaintiffs instead ask the Court to redress the alleged disability discrimination by ordering Defendants to come into compliance with their responsibilities under the Rehabilitation Act and ACA. As *Crower v. Kitagawa*, 81 F.3d 1480 (9th Cir. 1996), and other cases demonstrate, this Court can issue such an order. *See* Opp. at 21–22. Finding no support for Defendants' suggestion that agency regulation should be shielded from challenge if implemented at the direction of the legislature, the Court finds that Plaintiffs have satisfied the "relatively modest" requirement of showing redressability. *Renee*, 623 F.3d at 797.

Accordingly, the Court **DENIES** Defendants' motion to dismiss on standing grounds.

---

[11] The Court understands Defendants' position that Plaintiffs' allegations about the relationship between CHHSA and DMHC are conclusory since they are based almost exclusively on statutory language, *see* Reply at 11, but finds that at this early stage of litigation, Plaintiffs have little else on which to rely and have sufficiently alleged that at least formally, CHHSA acts through its departments. Just as the *Sharer* court did, the Court finds it appropriate at this stage to draw preliminary conclusions about real-world facts from the face of statutes defining agency relationships. If factual developments ultimately undermine those conclusions, Defendants are not barred from challenging standing in the future.

United States District Court
Northern District of California

### E.    Statute of Limitations

Defendants argue that Plaintiffs' claims are foreclosed by a four-year statute of limitations because Defendants did not take any action since promulgating the Plan in 2016 that could conceivably give rise to Plaintiffs' claim.  Mot. at 31.  Plaintiffs disagree and maintain that the time to bring their discrimination claims has not lapsed given that Defendants' allegedly discriminatory regulation is still in place.  Opp. at 15–17.  At this point in the proceedings, the Court finds dismissal on this basis unwarranted.

At the motion to dismiss stage, any statute of limitations bar must be "apparent on the face of the complaint."  *Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 902 (9th Cir. 2013).  A motion to dismiss based on a statute of limitations affirmative defense "may be granted only if the assertions in the complaint, read with the required liberality, would not permit the plaintiff[s] to prove" that their claims are not time-barred.  *Pisciotta v. Teledyne Indus., Inc.*, 91 F.3d 1326, 1131 (9th Cir. 1996).

In arguing that Plaintiffs' claims are time-barred, Defendants assert that "the right to bring a civil suit challenging the adoption of a regulation 'accrues upon the completion of the administrative proceedings[,]'" such that Plaintiffs needed to bring their claim within four years of the Plan's promulgation on November 28, 2016.  Reply at 12 (quoting *Wind River Min. Corp. v. United States*, 946 F.2d 710, 716 (9th Cir. 1991)).  Defendants cite numerous cases brought under the Administrative Procedure Act ("APA") to support this contention, without ever explaining why the Court should apply the holdings from APA regulatory challenges to this disability discrimination case.  *See* Reply at 12–13.  In fact, Defendants not only characterize these APA cases as "the governing law[,]" but dismiss the relevance of Plaintiffs' proffered disability discrimination caselaw on the basis of it involving "physical barriers or denials of employment or disability services."  *Id.* at 12.

The inapplicability of Plaintiffs' cases – the holdings of which set out a different conception of claim accrual for statute of limitations purposes in the context of disability discrimination claims – is not obvious to the Court.  In their complaint, Plaintiffs allege that Defendants "codif[y] and enforce[]" the Plan, which "deni[es] meaningful access to durable

1    medical equipment including wheelchairs" on an ongoing basis.  SAC ¶ 76.  Based on *Pickern v.*

2    *Holiday Quality Foods*, 293 F.3d 1133 (9th Cir. 2002), and other authorities, Plaintiffs argue that

3    their allegations support the notion that they face a "continuing violation" into the present, such

4    that their legal challenge is not stale.  Opp. at 16.  The Court need not definitively decide what

5    framework applies at this juncture, because Defendants have not met their burden of showing that,

6    construed "liberally," the face of Plaintiffs' complaint forecloses *any* possibility that their claims

7    are timely.

8         For this reason, the Court **DENIES** Defendants' motion to dismiss Plaintiffs' complaint as

9    time-barred.

10        **F.    Discrimination Claim**

11        Lastly, Defendants argue that Plaintiffs have not stated a claim for disability

12   discrimination.  Mot. at 26–31.  While the Court has some skepticism that Plaintiffs ultimately

13   will be able to prove their claims, they have done enough to proceed for now.

14        To establish a violation under the ACA, a plaintiff must meet the elements of a

15   Rehabilitation Act claim.  *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1210 (9th Cir. 2020), *cert.*

16   *dismissed*, 142 S. Ct. 480 (2021).  And under the Rehabilitation Act, a plaintiff must show that: (1)

17   he or she is a "qualified individual with a disability," (2) he or she was "either excluded from

18   participation in or denied the benefits of" the "services, programs, or activities" of an entity, "or

19   was otherwise discriminated against by the [. . .] entity," (3) the entity that denied him or her the

20   services received federal financial assistance, and (4) "such exclusion, denial of benefits, or

21   discrimination was by reason of his [or her] disability."  *Payan v. L.A. Cmty. Coll. Dist.*, 11 F.4th

22   729, 737–38 (9th Cir. 2021).  "Rather than try to classify particular instances of discrimination as

23   intentional or disparate-impact, [courts] focus[] on whether disabled persons had been denied

24   'meaningful access' to state-provided services" and look to "the standard articulated in [*Alexander*

25   *v.*] *Choate*" to do so.  *CVS Pharmacy*, 982 F.3d at 1210 (citing *Mark H. v. Lemahieu*, 513 F.3d

26   922, 937 (9th Cir. 2008)).  Under the test set forth in *Choate*, courts first consider "the nature of

27   the benefit [plaintiffs] were allegedly denied" and then "whether the plan provided meaningful

28   access to the benefit."  *Id*. (citing *Alexander v. Choate*, 469 U.S. 287 (1985)).

United States District Court
Northern District of California

United States District Court
Northern District of California

Construing the pleadings in the light most favorable to the Plaintiffs, as it must, the Court finds that Plaintiffs have adequately alleged that they were denied meaningful access to a benefit (i.e. wheelchair coverage) needed to address a condition that is a proxy for their mobility disability. Plaintiffs allege that the Plan adopted by Defendants excludes wheelchairs as a listed essential health benefit in the durable medical equipment (DME) subcategory, while recognizing that the Plan provides coverage for wheelchairs of up to $2,000 annually, subject to a "home use" rule.[12] SAC ¶ 7. Plaintiffs allege that an appropriate, medically necessary wheelchair (defined as one that "meets the user's needs and environmental conditions, provides a proper fit and postural support, has properly configured technology, and is safe and durable") is the "standard of care for people with mobility disabilities who cannot walk or have difficulty walking." *Id.* ¶ 42. Plaintiffs allege that access to such a wheelchair benefits people with mobility disabilities in countless ways, such as by enabling them to "participate fully in community life," "access education, employment, [and] family life," "reduce the risk" of institutionalization, and enjoy greater independence and improved health. *Id.* ¶¶ 43, 44. However, Plaintiffs allege that an appropriate wheelchair (and its attendant benefits) is largely out of reach for them and others similarly situated because one costs "far more than what many insured individuals in California can pay out of pocket." *Id.* ¶ 45. Plaintiffs estimate that manual wheelchairs intended for daily use cost between $3,000 and $5,000, and that "most power wheelchairs cost a few thousand dollars," but can reach as high as $50,000. *Id.* Considering these costs, Plaintiffs maintain that the $2,000 coverage limitation on wheelchairs is an insurance benefit design that prevents people with disabilities from "meaningfully accessing" medically necessary durable medical equipment. *Id.* ¶¶ 71, 73. Because the fit between the denied benefit (wheelchairs) and the disability (limited mobility) is so close, they argue that the Plan discriminates by proxy. *Id.* ¶ 72.

---

[12] The Court notes that the parties disagree on the definition of "home use" and the resulting import of this rule. Plaintiffs allege that the home use rule disallows coverage for any wheelchairs used outside the home. SAC ¶ 7 n.2. Defendants contend that a more reasonable inference is that the qualifier "home use" stands in contrast to clinical or hospital use, and does not proscribe a wheelchair's operation outside the home. Mot. at 13 n.2. The Court declines to decide at this point which definition is correct, because under either, the Court is of the view that Plaintiffs have done enough to state a disability discrimination claim at this early stage of litigation.

Defendants, unsurprisingly, have a different view.  They argue that wheelchairs are not a covered benefit under the ACA, such that denial of their coverage is not actionable.  Mot. at 26–28.  While it is true that wheelchairs do not appear as an enumerated type of DME covered under ACA regulations or the Plan in the "rehabilitative and habilitative services and devices" category, compliance with a state's EHB-benchmark plan does not necessarily guarantee compliance with Section 1557.  *Schmitt v. Kaiser Found. Health Plan of Washington*, 965 F.3d 945, 955–56 (9th Cir. 2020).  This is because the ACA requires that to quality as EHB-benchmark plan, a state-selected benchmark plan must not only include the ten specified categories of benefits – of which rehabilitative and habilitative services and devices are one – but also must "not include discriminatory benefit designs that contravene the non-discrimination standards[.]"  *Id*. at 956.  In other words, inclusion of the ten specified categories of essential health benefits is a "minimum requirement," but not a safe harbor.  *Id.* at 955.  Benchmark plans can be challenged for failing to provide the essential health benefits guaranteed under the ACA if their benefit design, or the implementation of their benefit design, discriminates on the basis of disability.  *Id*.  And benefit designs extend to "covered benefits, *benefits limitations or restrictions*, and cost-sharing mechanisms, such as coinsurance, copayments, and deductibles."  *Id*. (emphasis in original).

Under *Schmitt*, then, Plaintiffs can challenge the Plan's exclusion or limitation of wheelchair benefits.  Defendants suggest that here, however, Plaintiffs seek to define the relevant benefit as an unfounded entitlement to "unlimited wheelchair coverage."  Mot. at 30.  But the Court does read the complaint to argue for an "unlimited" wheelchair coverage benefit under the Plan.  Instead, construing their pleadings in the light most favorable to them, Plaintiffs allege that given the annual coverage limitations imposed by the Plan on wheelchairs, and the alleged cost of wheelchair purchase and maintenance, they are effectively denied *any* wheelchair benefit.  *See* SAC ¶¶ 7, 45, 76, 81.  They also allege that wheelchair coverage falls under the scope of DME benefits, which is a subcategory within the rehabilitative and habilitative service and device category.  *Id.* ¶ 40.  Like the prescription drug benefits at issue in *Doe v. CVS Pharmacy*, rehabilitative and habilitative services and devices are essential benefits that must be covered under the ACA.  *CVS Pharmacy*, 982 F.3d at 1210.  As such, the Court is satisfied at this stage

United States District Court
Northern District of California

that Plaintiffs have pled entitlement to a benefit.

Defendants argue that even assuming that Plaintiffs are entitled to DME such as wheelchairs, they cannot properly show they were denied meaningful access to that benefit. Defendants contend that the fact that the Plan does not cover wheelchairs to the extent that Plaintiffs would like does not mean that they are excluded, or that the imposition of a $2,000 annual cap is discriminatory, especially since there are non-discriminatory reasons why wheelchairs might not be covered as DME. Mot. at 29; Reply at 15. Defendants additionally contend that any discrimination by proxy theory fails because, based on *Schmitt*, Plaintiffs "allege no facts giving rise to an inference of intentional discrimination by the exclusion itself." Mot. at 30 (quoting *Schmitt*, 965 F.3d at 959).

However, Defendants misquote *Schmitt*. In *Schmitt*, the court observed that the plaintiff "allege[d] no facts giving rise to an inference of intentional discrimination *besides* the exclusion itself." *Schmitt*, 965 F.3d at 959 (emphasis added). Because the proxy's "fit" in that case was not "sufficiently close" to make a discriminatory inference plausible, the plaintiff's claims did not survive. *Id*. at 960. However, the *Schmitt* court did not require, as Defendants seem to suggest, that a plaintiff allege facts to show anything other than a close fit between the benefit exclusion or limitation and the disability. A properly pled exclusion *is* the circumstance that gives rise to an inference of disability discrimination; a plaintiff need not allege *additional* facts showing intentional discrimination. *Id*.

Here, Plaintiffs have alleged that they are denied meaningful access to wheelchairs, a type of rehabilitative device, because the Plan promulgated by Defendants allegedly limits wheelchair coverage to an extent that means virtually no wheelchairs are fully covered. They argue that this is discriminatory because the coverage limitation denies a benefit (the ability to obtain an appropriate wheelchair) needed to address a condition that is a proxy for their mobility disability. SAC ¶ 72. Unlike in *Schmitt*, the denial of coverage of appropriate wheelchairs is neither an overinclusive proxy for mobility disability (because nondisabled people do not need wheelchairs on an ongoing basis) nor an underinclusive one (because for people with mobility disabilities, there is arguably no alternative to an appropriate wheelchair). Opp. at 28–29. The Court is

United States District Court
Northern District of California

therefore satisfied that Plaintiffs have alleged a sufficiently close proxy to give rise to an inference of discrimination.  The Court reiterates that whether Plaintiffs can adduce sufficient facts to actually prove their allegations about fit – for example, by showing that wheelchairs are on the main prohibitively expensive in light of the $2,000 cap – is an entirely separate question for a later stage of the case.

Finally, the Court comments briefly on Defendants' warning that finding for Plaintiffs will mean that, moving forward, "any service or device that has not been designated by the State as an essential health benefit, and that is needed by a disabled person, must be covered in order to avoid discrimination." *Id.*  While the Court is not persuaded that so drastic a result must follow even if Plaintiffs ultimately win this case, it certainly views Defendants' prediction as overstated at this stage.  As the Court has repeatedly emphasized, the allegations credited in this order are ones that Plaintiffs must ultimately substantiate in order to prevail.  If they fail to do so, Defendants can raise any appropriate arguments based on a more developed record.

## IV.   CONCLUSION

The Court **DENIES** Defendants' motion to dismiss, Dkt. No. 77.  It also **GRANTS in part and DENIES in part** Plaintiffs' request for judicial notice, Dkt. No. 81, and **GRANTS** Defendants' requests for judicial notice, Dkt. Nos. 34-1, 83.

The Court further **SETS** a telephonic case management conference on December 19, 2023, at 2:00 p.m. All counsel shall use the following dial-in information to access the call:

Dial-In: 888-808-6929

Passcode: 6064255

All attorneys and pro se litigants appearing for a telephonic case management conference are required to dial in at least 15 minutes before the hearing to check in with the courtroom deputy. For call clarity, parties shall NOT use speaker phone or earpieces for these calls, and where at all possible, parties shall use landlines.

//

//

The Court **DIRECTS** the parties to meet and confer and submit a joint case management statement by December 12, 2023.  At the case management conference, the parties should be prepared to discuss how to move this case forward efficiently.

**IT IS SO ORDERED.**

Dated: 11/22/2023

HAYWOOD S. GILLIAM, JR.
United States District Judge